UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BEATRICE PHELPS, as Assignee of the Rights of
Christopher M. Dwyer,

                    Plaintiff,

                                      6:12-CV-1585
v.                                   (GTS/DEP)

GEICO INDEMNITY COMPANY,

                    Defendant.
_____

APPEARANCES:                        OF COUNSEL:

OFFICE OF ROBERT E. LAHM          ROBERT E. LAHM, ESQ.
  Counsel for Plaintiff
711 East Genesee Street
Syracuse, NY 13202

HURWITZ & FINE, P.C.              DAN D. KOHANE, ESQ.
  Counsel for Defendant            JENNIFER A. EHMAN, ESQ.
1300 Liberty Building
424 Main Street
Buffalo, NY 14202

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this insurance action by Beatrice Phelps as assignee of the

rights of Christopher M. Dwyer ("Plaintiff") against GEICO Indemnity Company ("Defendant"),

is Defendant's motion for summary judgment. (Dkt. No. 26.) For the reasons set forth below,

Defendant's motion is granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Generally, in her Complaint, Plaintiff alleges that Defendant acted in bad faith in defending its insured (who is now Plaintiff's assignor) in a personal-injury case by Plaintiff in state court, arising from a three-car motor vehicle accident that occurred on March 5, 2007, during "snow white-out" conditions.  (Dkt. No. 1, Attach. 1.)  More specifically, Plaintiff alleges that Defendant wrongfully refused to raise its pretrial settlement offer of $5,000 to its policy limit of $25,000 despite knowing at trial that (a) Plaintiff's medical expenses exceeded $16,000, (b) the case would settle if the three auto defendants together offered their respective policy limits, (c) one of Defendant's two co-defendants had offered its policy limit of $50,000, (d) Defendant's insured was unable to personally pay any amount of his share of damages in excess of $25,000, and (e) the jury made it evident during deliberations that they were going to award damages to Plaintiff (by asking whether any award for future damages would be granted as an annuity or a lump sum).  (*Id*.)  Based on these allegations, Plaintiff claims that Defendant breached its implied duty of good faith and fair dealing to its insured.  (*Id*.)  As a result, Plaintiff alleges that she has been damaged in the amount of $121,163.68, consisting of the unpaid jury verdict in the state court case, the unpaid interest on that verdict, and her costs and disbursements in that case.  (*Id*.)  Familiarity with Plaintiff's claim and the factual allegations supporting it is assumed in this Decision and Order, which is intended primarily for review by the parties.

### B.    Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and properly supported by Defendant in its Statement of Material Facts (i.e., its "Rule 7.1 Statement"), and were either

admitted or denied without proper support by Plaintiff in her response thereto (i.e., her "Rule 7.1 Response"). (*Compare* Dkt. No. 26, Attach. 31 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 27 [Plf.'s Rule 7.1 Response].)

<u>The Accident</u>

1.  On March 5, 2007, at approximately 3:25 p.m., a three car-motor vehicle accident occurred on Jug Point Road, in the Town of Verona, New York.

2.  The Police Accident Report, completed by Trooper Francis Labarbera, identifies the involved individuals as Melissa A. Ranger (the driver of Vehicle 1), Christopher M. Dwyer (the driver of Vehicle 2) and Jamie Cogan (the driver of Vehicle 3).

3.  Plaintiff and her sister, Bonnie, are listed as passengers in the vehicle driven by Melissa A. Ranger ("Ranger").

4.  Trooper Labarbera ticketed Ranger with a violation of New York Vehicle and Traffic Law § 1120A, entitled "Drive on right side of roadway."

5.  No tickets were issued to Jamie Cogan or Dwyer.

6.  On the same day as the accident, Dwyer reported the incident to his automobile insurer, Defendant.

7.  Dwyer was the named insured on a family automobile policy, policy number 4056-00-34-62, with limits of $25,000 per person and $50,000 per occurrence.

8.  In describing the loss, Dwyer reported that the Ranger vehicle came into his lane of travel and struck him.

9.  Immediately upon receipt of the claim, Defendant began its investigation, which included obtaining a copy of the Police Report that identified Ranger as at fault for the loss, and attributed no liability to Dwyer.

10.     Dwyer completed a GEICO accident reporting form.  In response to the question, "state cause of damage or loss if other than accident," Dwyer responded "she hit me head on."

11.     On March 26, 2007, Defendant was faxed a letter of representation from the Joyce Law Firm. The letter indicated that Plaintiff and Bonnie Phelps sustained certain injuries as a result of the motor vehicle accident of March 5, 2007.

12.     In response, Defendant denied coverage for any losses allegedly sustained by Plaintiff and Bonnie Phelps.

13.     After the denial was issued, the Joyce Law Firm conducted a review of the matter identifying a potential medical malpractice claim in additional to automobile liability.  On approximately December 5, 2007, the Joyce Law Firm referred Plaintiff's case to Attorney Robert E. Lahm of Robert E. Lahm PLLC, Attorneys at Law, a practitioner with significant experience in his area of the law.

14.     In addition, Attorney Samantha M. Holbrook (of the Joyce Law Firm) advised that she had made a demand for Ranger's policy limit.

15.     In a letter of December 10, 2007, Mr. Lahm acknowledged the file.

16.     In his deposition, Mr. Lahm acknowledges that, when the file first came into this office, from the automobile prospective, Ranger was his primary target.  In the letter, no reference was made to either Jamie Cogan or Dwyer, and no evidence was noted attributing negligence to them.

## "Phase One" of the State Court Case

17.     On September 18, 2008, a lawsuit was commenced in Supreme Court, County of Oneida, styled *Beatrice S. Phelps v. Melissa A. Ranger, Christopher M. Dwyer, Jamie C. Cogan, Stephanie M. Cogan, Oneida Health Care Corporation a/k/a Oneida Heathcare Center, Michael*

*Thomas, M.D., Robert M. Goldberg, M.D., Daniel M. Ratnarajah, M.D. Oneida Surgical Group,*

*P.C., Alberto Delpino, M.D., and Pedro Delpino, M.D.*, Index Number 2008-002824.

18.    The Complaint asserted that Plaintiff sustained injury as a result of the motor

vehicle accident and subsequent medical malpractice.

19.    The First Cause of Action was directed against Ranger.

20.    The Second Cause of Action was directed against Dwyer.

21.    The Third Cause of Action was directed against Jamie Cogan, and the Fourth and

Fifth Causes of Action were directed at certain medical professionals that treated Plaintiff.

22.    Upon receipt of the Summons and Complaint, Dwyer forwarded the papers to

Defendant.

23.    In a letter dated October 29, 2008, Ms. Elizabeth August, the GEICO claims

examiner assigned to the claim, acknowledged receipt of the papers and informed Dwyer that his

defense in the underlying action was being referred to the law firm of Melvin & Melvin, PLLC.

Among other things, the letter also advised Dwyer that, "[s]ince the amount sued for is not

specified and may be more than the insurance policy limits, you may want to obtain your own

attorney, at your own expense, to cooperate with the defense attorney to protect your interests

against an excess verdict . . . ."[1]

24.    When the case was first sued, Mr. Lahm was not looking toward early resolution

or piecemeal settlement.

25.    In a letter dated July 6, 2009, Phelps provided defendants an initial demand of

$400,000 to resolve all claims in the action including those related to negligence and medical

malpractice.

_____

[1]    (Dkt. No. 26, Attach. 24, at 2 [attaching letter]; Dkt. Nol. 26, Attach. 31, at ¶ 24
[Plf.'s Rule 7.1 Response, admitting existence of letter]; Dkt. No. 29, at 16 [attaching page "12"
of Plf.'s Opp'n Memo. of Law, relying fact asserted above].)

26.     Dwyer had a policy limit of $25,000 per person; Ranger was insured under a policy issued by A. Central Insurance with policy limits of $50,000 per person/$100,000 per accident; and Cogan was insured by State Farm Insurance Company under a policy with limits of $100,000 per person/$300,000 per accident.

27.     Defendant could not have settled the case at this point.

28.     Following the completion of those depositions related to the motor vehicle accident, in a letter dated November 16, 2009, Attorney Michael R. Vaccaro (of Melvin & Melvin) requested that the action against Dwyer be discontinued.

29.     On November 20, 2009, on behalf of Plaintiff, Mr. Lahm executed the stipulation discontinuing the action against Dwyer.

30.     Unfortunately for Dwyer, while Plaintiff agreed to discontinue her action against them, counsel for Ranger refused to execute the agreement and discontinue the cross-claims.

31.     Notice of issue was filed by Plaintiff on or about February 22, 2010.

32.     From this point until the time of trial, there was no change in the physical evidence.

33.     Cogan then moved for summary judgment. Dwyer and Ranger cross-moved for summary judgment.

34.     Ranger's cross-motion contained an affidavit from Bonnie Phelps, who had not previously been deposed. For the first time, and contrary to the testimony provided by her mother and sister, she attested to a second impact. Concerns were raised by Mr. Vaccaro as to the credibility of this affidavit.

35.    The motions were argued on April 28, 2010, before the Hon. Bernadette Clark. In

an Order dated May 18, 2010, and entered on May 26, 2010, all motions were denied.[2]

36.    All automobile defendants in the underlying action appealed the decision. Ms.

August testified that the case was discussed by her team, and everyone involved in the case

agreed to file the appeal.

37.    The appeal was then heard by the New York Appellate Division, Fourth

Department on September 15, 2011.[3]

38.    In a decision, dated September 30, 2011, the Appellate Division affirmed

the trial court's decision.[4]

39.    After receiving the appellate court's decision, Defendant offered Plaintiff $3,000

to settle her claim against Dwyer, which Plaintiff refused.[5]

---

[2]    (*Compare* Dkt. No. 26, Attach. 31, at ¶ 36 [Def.'s Rule 7.1 Statement, citing to portion of record containing the Order] *with* Dkt. No. 27, at ¶ 36 [Plf.'s Rule 7.1 Response, admitting the fact asserted "in part" but failing to identify what portion she is denying, failing to cite record evidence that controverts the fact asserted, asserting additional material facts purportedly in dispute that belong in separately numbered paragraphs under Local Rule 7.1(a)(3), and citing to portion of record that contains same Order presented by Defendant].)

[3]    (*Compare* Dkt. No. 26, Attach. 31, at ¶ 38 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 27, at ¶ 38 [Plf.'s Rule 7.1 Response, admitting the fact asserted "in part" but failing to identify what portion she is denying, failing to cite record evidence that controverts the fact asserted, and asserting additional material facts purportedly in dispute that belong in separately numbered paragraphs under Local Rule 7.1(a)(3)].)

[4]    (*Compare* Dkt. No. 26, Attach. 31, at ¶ 39 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 27, at ¶ 39 [Plf.'s Rule 7.1 Response, admitting the fact asserted "in part" but failing to identify what portion she is denying, failing to cite record evidence that controverts the fact asserted, and asserting additional material facts purportedly in dispute that belong in separately numbered paragraphs under Local Rule 7.1(a)(3)]; *see also* Dkt. No. 27, Attach. 5 [attaching copy of decision].)

[5]    (Dkt. No. 26, Attach. 21, at 24-26 [attaching entries in Ms. August's Activity Log, from 2:50 p.m. on Oct. 25, 2011, 11:57 a.m. on Oct. 26, 2011, and 11:36 a.m. on Nov. 22,

<u>"Phase Two" of the State Court Case</u>

40.     During the weeks before trial, Defendant offered Plaintiff $5,000 to settle her claim against Dwyer, which Plaintiff refused.[6]

41.     Five days before jury selection, on February 1, 2012, Plaintiff discontinued her action against the remaining medical providers, Alberto DelPino, M.D., Oneida Surgical Group, P.C., Michel Thomas, M.D., and Oneida Healthcare Center; this left only the automobile defendants in the action.[7]

42.     In light of the discontinuance, Ms. August and Mr. Vaccaro discussed seeking a bifurcated trial, an option previously unavailable with the involvement of the medical providers.

43.     Mr. Vaccaro submitted a letter to the Court, dated February 1, 2012, raising the possibility of bifurcation of the trial. The Court declined the request.

44.     The action came on for trial against the three auto defendants (Ranger, Dywer and

---

2011]; Dkt. No. 26, Attach. 12, at 2 [attaching letter from Mr. Lahm dated Nov. 23, 2011]; Dkt. No. 26, Attach. 5, at 45-46 [attaching pages "44" and "45" of Lahn Dep. Tr.]; Dkt. No. 27, at ¶ 39 [Plf.'s Ru;e 7.1 Response, stating, "After the appellate court's decision, Elizabeth August, the claims adjuster for Defendant GEICO, made an offer of $3,000 to settle Beatrice Phelps' action"].)

[6]     (Dkt. No. 26, Attach. 21, at 21 [attaching entry in Ms. August's Activity Log, from 3:28 p.m. on Jan. 18, 2012]; Dkt. No. 26, Attach. 5, at 46-47 [attaching pages "45" and "46" of Lahn Dep. Tr.]; Dkt. No. 27, at ¶ 39 [Plf.'s Rule 7.1 Response, stating, "Almost contemporaneous with trial, [Ms. August] raised the offer to $5,000"].)

[7]     (*Compare* Dkt. No. 26, Attach. 31, at ¶ 40 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 27, at ¶ 40 [Plf.'s Rule 7.1 Response, admitting the fact asserted "in part" but failing to identify what portion she is denying, failing to cite record evidence that controverts the fact asserted, and asserting additional material facts purportedly in dispute that belong in separately numbered paragraphs under Local Rule 7.1(a)(3)].)

Cogan).[8]  Immediately before trial, Ranger tendered her policy limit of $50,000.[9]

45.    Jury selection began on February 6, 2012.[10]  Following jury selection, Mr. Lahm

stated on the record that "this case can be settled within the policy limits."[11]  More specifically,

Mr. Lahm attempted to settle the case for $85,000, but he needed a contribution from each of the

three auto defendants to reach that amount.[12]  However, Cogan never offered an amount in

excess of $3,000, and Defendant never raised its pretrial offer of $5,000.[13]

---

[8]    (Dkt. No. 1, Attach. 1, at ¶ 17 [Plf.'s Compl.].)

[9]    (*Compare* Dkt. No. 26, Attach. 31, at ¶ 43 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 27, at ¶ 43 [Plf.'s Rule 7.1 Response, admitting the fact asserted "in part" but failing to identify what portion she is denying, failing to cite record evidence that controverts the fact asserted, and asserting additional material facts purportedly in dispute that belong in separately numbered paragraphs under Local Rule 7.1(a)(3)]; *see also* Dkt. No. 26, Attach. 5, at 48-49 [attaching pages "47" and "48" of Lahn Dep. Tr.].)

[10]    (*Compare* Dkt. No. 26, Attach. 31, at ¶ 44 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 27, at ¶ 44 [Plf.'s Rule 7.1 Response, admitting the fact asserted "in part" but failing to identify what portion she is denying, failing to cite record evidence that controverts the fact asserted, and asserting additional material facts purportedly in dispute that belong in separately numbered paragraphs under Local Rule 7.1(a)(3)].)

[11]    (Dkt. No. 1, Attach. 1, at ¶ 18 [Plf.'s Compl.].)

[12]    (Dkt. No. 26, Attach. 5, at 46-51 [attaching pages "45" through "50" of Lahm Dep. Tr., stating, inter alia, that Lahm "probably would have settled [the case] at eighty-five [thousand dollars]"]; Dkt. No. 27, at ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Before trial, Plaintiff's counsel attempted to settle the case for $85,000"]; *cf.* Dkt. No. 26, Attach. 21, at 25 [attaching entry in Ms. August's Activity Log, from 11:57 a.m. on Oct. 26, 2011, indicating she received a phone call from Mr. Lahm and he stated he would "not going to let one carrier out. Its [sic] either all or none"]; Dkt. No. 26, Attach. 12 [attaching Lahm's letter of Nov. 22, 2011, indicating that, pretrial, "the case could go away" if the three auto defendants contributed $70,000 in total].)

[13]    (Dkt. No. 26, Attach. 5, at 49-50 [attaching pages "48" and "49" of Lahn Dep. Tr.]; Dkt. No. 26, Attach. 21, at 17-18 [attaching entry in Ms. August's Activity Log, from 3:59 p.m. on Feb. 6, 2012, and 4:42 p.m. on Feb. 8, 2012, indicating that "no further settlement discussions occurred at the conference this morning," and "Ranger did eventually extend their [policy of] 50k. They are still in the case"]; *cf.* Dkt. No. 26, Attach. 21, at 20 [attaching entry in Ms. August's Activity Log, from 12:09 p.m. on Feb. 1, 2012, indicating State Farm's intent to

46.     At the end of trial, the jury returned a verdict of $60,000 for past pain and suffering and $94,900 for future pain and suffering.[14]  The jury found Ranger 50% liable for Plaintiff's injuries and Dwyer 50% liable for Plaintiff's injuries.[15]  After the verdict was returned, Defendant gave authority to tender its policy limit of $25,000.

47.     The $25,000 policy limit was paid to Plaintiff.  (Her attorney, Mr. Lahm, signed a partial satisfaction of judgment on January 10, 2013.)

The Current Action

48.     On or about September 19, 2012, Plaintiff filed the Summons and Complaint in this action with the Oneida County Clerk's Office.

49.     The action was commenced by Plaintiff as assignee of the rights of Dwyer, pursuant to an assignment of rights executed by Plaintiff and Dwyer on September 5, 2012.

50.     Defendant filed a Notice of Removal to the United States District Court, Northern District of New York. The removal was granted.

**C.     Parties' Briefing on Defendant's Motion**

**1.     Defendant's Memorandum of Law**

Generally, in its memorandum of law, Defendant argues that the record is devoid of evidence that it acted in gross disregard of its insured's interests in the state court action for three reasons.  (Dkt. No. 26, Attach. 30.)

First, Defendant argues, Plaintiff never made a clear settlement demand within Defendant's policy limit of $25,000, because (a) in "Phase One" of the case, she refused

keep its offer the same].)

---

[14]     (Dkt. No. 1, Attach. 1, at ¶ 23 [Plf.'s Compl.].)

[15]     (Dkt. No. 1, Attach. 1, at ¶ 24 [Plf.'s Compl.].)

to settle with Defendant (due to her desire to avoid an "empty chair" in her surviving action against her medical providers), and (b) in "Phase Two" of the case, she sought a "global resolution" of the case that required an offer from Cogan of $10,000, which never came.  (*Id.*)

Second, Defendant argues, even if Defendant had the ability to independently settle the claim against its insured at trial, it was under no obligation to do so, because significant issues existed concerning its insured's liability (e.g., due to the fact that the car in which Plaintiff had been riding had crossed the center double yellow line and had hit Defendant's insured head on in his own lane where his visibility was reduced, a fact recognized by both a state trooper and Plaintiff herself).  (*Id.*)

Third, Defendant argues, even setting aside the lack of a clear settlement demand within Defendant's policy limit of $25,000 and the existence of significant issues concerning its insured's liability, a consideration of the remaining facts and circumstances of the state court case establish that Defendant's actions were not the result of a deliberate or reckless failure to place on equal footing the interests of its insured and itself but an overoptimism of events at trial (following its thorough investigation of the claim, retention of experienced counsel, and careful monitoring of the case).  (*Id.*)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff asserts eight interrelated arguments.  (Dkt. No. 29 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues, it was clear that (a) the jury was going to render a verdict in favor of Plaintiff (e.g., given the inconsistency between Dwyer's and Cogan's testimony regarding the tire tracks, the discrediting of the state trooper at trial, the trial judge's "admonish[ment]" of defense counsel outside the presence of the jury, and the jury's question of whether any award

for future damages would be granted as an annuity or a lump sum), and (b) the verdict would be above Defendant's policy limit of $25,000 (given her injuries).  (*Id*.)

Second, Plaintiff argues, Defendant's insured lost an actual opportunity to settle the claim at the time when all serious doubts about his liability were removed, given (a) the evidence that Defendant's insured was driving in conditions in which he could not see where he was going, that the center line was so covered with snow that he could not possibly have known which lane he was in, that he brushed against a snowbank on the right side of the road, and that Ranger's vehicle could have come to a stop in his lane before impact), and (b) the fact that Plaintiff's desire for a global settlement from both Dwyer and Cogan did not relieve Defendant of its duty to offer its policy limit.  (*Id*.)

Third, Plaintiff argues, Defendant failed to investigate the claim in light of the facts as they were revealed throughout the litigation and in light of the law of the State of New York (putting its insured at an unreasonable risk of a personal judgment), because (a) Defendant's claims adjuster, Ms. August, admits she never read Dwyer's deposition transcript, (b) Defendant failed to interview witnesses and examine the accident scene, and (c) Defendant misinterpreted and/or misapplied the emergency doctrine (and failed to change its theory of the case after the courts' rejection of that doctrine).  (*Id*.)

Fourth, Plaintiff argues, Defendant made no genuine attempt to settle Plaintiff's claim within the policy limit of $25,000, but offered merely $5,000, which was "a farce" amounting to the case's "nuisance value."  (*Id*.)

Fifth, Plaintiff, argues, the fact that Defendant never informed its insured of the status of settlement negotiations or that he faced financial ruin in the event of a finding of even 1% liability against him and an award of damages in excess of his policy limit of $25,000 is evident

from (a) the lack of a notation regarding any such communications on Defendant's activity log, and (b) "Dwyer's shocked reaction" after learning of the verdict and the amount for which he was personally responsible. (*Id*.)

Sixth, Defendant never informed its insured of the financial risk he faced should the jury find him liable and award damages in excess of his policy limit of $25,000. (*Id*.)

Seventh, Plaintiff argues, the culmination of Defendant's actions and omissions equates to a gross disregard of its insured's interests. (*Id*.)

Eighth, Plaintiff argues, the case heavily relied on by Defendant--*Pavia v. State Farm*, 82 N.Y.2d 445 (N.Y. 1993)--is distinguishable, inapposite and not on point, because, *inter alia*, (a) the current case involved a three-car motor vehicle accident in which "none [of the drivers] was absolved of liability until the moment the jury rendered its verdict," (b) the reason Defendant did not tender its policy was not new-found facts that needed to be investigated but a "mistaken belief that its insured would never be found . . . liable," and (c) Plaintiff did not reject a tender of the policy but was "open to an offer of [that] . . . policy until the moment the jury rendered its verdict." (*Id*.)

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply memorandum of law, Defendant asserts six arguments. (Dkt. No. 31 [Def.'s Reply Memo. of Law].)

First, Defendant argues, Plaintiff's first argument (i.e., that it was clear a jury was going to render a verdict in favor of Plaintiff above Defendant's policy limit) is wholly unsupported by the record for the following reasons: (a) Plaintiff does not attach the trial testimony reflecting the purported inconsistency between Dwyer's and Cogan's testimony regarding the tire tracks (which inconsistency, in any event, was not perceived by Defendant's trial monitor, as reflected

in the activity log); (b) Plaintiff does not attach the trial testimony reflecting the purported discrediting of the state trooper (which discrediting, in any event, was not perceived by Defendant's trial attorney, as reflected in the activity log); (c) Plaintiff does not attach the trial transcript reflecting when the trial judge purportedly "admonished" defense counsel; and (d) Plaintiff does not attach the trial record containing the question from the jury (and, in any event, the question is immaterial in that a verdict against Ranger was hardly unexpected). (*Id*.)

Second, Defendant argues, Plaintiff's second argument (i.e., that all serious doubts about the insured's liability were removed at trial) is undermined by the following facts: (a) after taking the deposition testimony of four witnesses to the accident (Dwyer, Ranger, Cogan and Phelps), Plaintiff executed a stipulation voluntarily dismissing the action against Dwyer; (b) at trial there was no new physical evidence adduce or change of law relied on; (c) rather, Plaintiff's counsel based his new pre-verdict opinion that Dwyer was liable solely on the decisions issued by the trial court and appellate division regarding the emergency doctrine; and (d) however, those decisions found merely that there was a *question of fact* regarding the doctrine (which Defendant's litigation team reasonably, although erroneously, believed a jury would resolve in Dwyer's favor). (*Id*.)

Third, Defendant argues, Plaintiff's third argument (i.e., that Defendant failed to investigate the claim in light of the facts as they were revealed throughout the litigation and in light of the law of the State of New York) is undermined by the following facts: (a) whether or not Defendant's claims adjuster, Ms. August, never read Dwyer's deposition transcript is immaterial because, despite knowing the contents of that transcript, Plaintiff's counsel agreed to voluntarily discontinue the action against Dwyer; (b) it is unclear how attempting to interview the five witnesses to the accident (i.e., the four litigants and Plaintiff's daughter) would have

changed Defendant's understanding of the case given that they were all represented by counsel and depositions had been conducted, and it is unclear how examining the scene would have changed Defendant's understanding of the case given that the cars had been removed and other discovery had been conducted; (c) Defendant actively investigated the matter, interviewing the insured, assigning experienced defense counsel to defend the insured, conducting depositions, uncovering all paper evidence necessary, and tracking the case's progress in a 58-page activity log; (d) the decisions of the trial court and appellate division did not reject all Dwyer's defenses but merely found a question of fact regarding the application of the emergency doctrine; and (e) the trial court's refusal to charge the jury regarding the emergency doctrine did not necessarily mean a verdict would be rendered against Dwyer because, even without the defense, Dwyer would still have had to be found negligent (and he had been struck in his own lane and had taken what were argued to be appropriate actions). (*Id.*)

Fourth, Defendant argues, Plaintiff's fourth argument (i.e., that Defendant made no genuine attempt to settle Plaintiff's claim) is simply not true given the following facts: (a) it is undisputed that Plaintiff refused to settle with Dwyer as long as a medical malpractice defendant was still in the action (the last of whom was released from the action on February 1, 2012); (b) Plaintiff offers only speculation (i.e., a "probab[ility]") that he would have settled with Dwyer had Defendant offered its policy limit and, in any event, Plaintiff would have made such a settlement only if the other two defendants' insurers offered their policy limits too (and Cogan's insurer never did); (c) Plaintiff's counsel testified in his deposition that open lines of communication were maintained between him and Defendant's claims adjuster, Ms. August, and that she called more than other adjusters; and (d) it is undisputed that Plaintiff demanded a global settlement, requiring contributions from all three parties (and that Cogan made no offer). (*Id.*)

Fifth, Defendant argues, Plaintiff's fifth argument (i.e., that Defendant never informed its insured of the financial risk he faced should the jury find him liable and award damages in excess of his policy limit) is undermined by the following facts: (a) the fact that, on October 29, 2008, Defendant sent Dwyer a letter stating that, "[s]ince the amount sued for is not specified and may be more than the insurance policy limits, you may want to obtain your own attorney, at your own expense, to cooperate with the defense attorney to protect your interests against an excess verdict . . ."; (b) during the course of the litigation, Dwyer was adamant that he did nothing wrong at the time of the loss, Defendant believed him, and Dwyer never demanded settlement; and (c) communication of Plaintiff's desire for a global settlement of $85,000 at trial was immaterial because Dwyer's policy limit was $25,000 and Cogan was not offering more than $3,000.  (*Id.*)

Sixth, Defendant argues, Plaintiff's sixth argument (i.e., that Defendant never informed its insured of the financial risk he faced should the jury find him liable and award damages in excess of his policy limit) ignores the fact that Dwyer never demanded settlement and, in any event, Defendant could not have settled the case due Plaintiff's demand for $85,000 from all three defendants and Cogan's refusal to offer more than $3,000.  (*Id.*)

### 4.    Plaintiff's Amended/Supplemental Record Evidence

After the filing of Defendant's reply memorandum of law, Plaintiff filed a letter-brief requesting leave to "attach" or "include," as "exhibits" to her opposition papers, copies of various trial transcripts from the state court proceeding, which Plaintiff argued were inadvertently omitted from her opposition papers.  (Dkt. No. 32.)  Over Defendant's objection, the Court gave Plaintiff permission to "amend/supplement her opposition to Defendant's motion for summary judgment *in the manner requested*."  (Text Order filed Dec. 11, 2013 [emphasis added].)

At no point in her letter-brief did Plaintiff request leave to amend or supplement her Rule 7.1 Response. (Dkt. No. 32.) To the contrary, she argued the exhibits related to "only one of the six points of argument" in her opposition memorandum of law (implying they were referenced in that point of argument). (*Id*.) However, when filing the copies of the various trial transcripts, Plaintiff also attempted to *amend* her Rule 7.1 Response. (*Compare* Dkt. No. 27 [Plf.'s Original Rule 7.1 Response] *with* Dkt. No. 35 [Plf.'s Am. Rule 7.1 Response].)

While inadvertent failures to attach exhibits to opposition papers may be excused (assuming the movant has a fair opportunity to challenge those exhibits and place them in the context of surrounding record evidence), the careful procedure for briefing a motion for summary judgment does not allow a non-movant, after a reply has been filed, to "amend" its responsive statement of facts in a way that effectively serves as a sur-reply to the movant's reply memorandum of law. Such an attempt is both unfair and inefficient.

Furthermore, the number of transcripts belatedly adduced by Plaintiff, and their lack of specific reference in her opposition papers, makes the Court understand what Defendant meant in its objection when it argued that Plaintiff's failure to attach them to her original Rule 7.1 Response was more than a mere "ministerial error." (Dkt. No. 33.)

Finally, the Court notes that Plaintiff's Amended Rule 7.1 Response does not correct the numerous defects in her original Rule 7.1 Response. (*Compare* Dkt. No. 27 [Plf.'s Original Rule 7.1 Response] *with* Dkt. No. 35 [Plf.'s Am. Rule 7.1 Response]; *see also, supra,* Part I.B. of this Decision and Order [noting in numerous footnotes the deficiencies of Plf.'s Original Rule 7.1 Response].)

For each of the foregoing reasons, while Plaintiff's Exhibits G through L are accepted for filing (Dkt. No. 35, Attach. 1-14),[16] her Amended Statement of Material Facts is rejected for filing and shall be struck from the docket.

### 5. Defendant's Supplemental Attorney Affirmation

Generally, in its supplemental attorney affirmation (filed with prior leave of the Court), Defendant adduces (a) a transcript of the motion to dismiss made by Dwyer and Cogan at trial (giving context to the exchange in which the trial judge "admonished" defense counsel), and (b) an index of the trial transcripts. (Dkt. No. 36, Attach. 1-2.)(Dkt. No. 36, Attach. 3 [Def.'s Suppl. Reply Memo. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v.*

---

[16] The Court notes that Exhibit M and N contain, respectively, a blank page and a copy of an Order not referenced in Plaintiff's letter-brief (and in any event previously submitted by both parties). (Dkt. No. 35, Attach. 15-16.)

*Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c),(e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c),(e).

What this burden-shifting standard means when a plaintiff has failed to respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996). Rather, practically speaking, the Court must (1) determine what material facts, if any, are disputed in the record presented on the defendants' motion, and (2) assure itself that, based on those undisputed material facts, the law indeed warrants judgment for the defendants. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

More specifically, where a plaintiff has failed to properly respond to a defendant's factual assertions contained in its Statement of Material Facts (also known as its "Rule 7.1 Statement"), the factual assertions contained in that Rule 7.1 Statement will be accepted as true to the extent that those facts are supported by the evidence in the record. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 243 (2d Cir. 2004); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996); N.D.N.Y. L.R. 7.1(a)(3); N.D.N.Y. L.R. 56.2.

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. *Morales v. N.Y.S. Dept. of Labor*, 530 F. App'x 13, 14 (2d Cir. July 16, 2013); *Call Ctr. Tech., Inc. v. Grand Adventures Tour & Travel Pub. Corp.*, 635 F.3d 48, 53, n.4 (2nd Cir. 2011); *In re Agent Orange Prod. Liability Litig.*, 517 F.3d 76, 92, n.14 (2nd Cir. 2008); *Lee v. Alfonso*, 112 F. App'x 106, 107 (2nd Cir. Oct. 14, 2004); *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir. 2002).

### B.   Legal Standard Governing Plaintiff's Claim

"In order to establish a prima facie case of bad faith, the plaintiff must establish that the insurer's conduct constituted a 'gross disregard' of the insured's interests--that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer." *Pavia v. State Farm Mut. Auto Ins. Co.*, 626 N.E.2d 24, 27 (N.Y. 1993). "[A] bad-faith plaintiff must establish that the defendant insurer engaged in a pattern of behavior evincing a conscious or knowing indifference to the probability that an insured would be held personally accountable for a large judgment." *Pavia*, 626 N.E.2d at 27-28. "The gross disregard standard . . . strikes a fair balance between two extremes by requiring more than ordinary negligence and less than a showing of dishonest motives." *Id.* at 28.

"Having established the proper legal standard, we necessarily shift to the sufficiency of plaintiff's proof in this case." *Id.* "Naturally, proof that a demand for settlement was made is a prerequisite to a bad-faith action for failure to settle." *Id.* "However, it does not follow that whenever an injury is severe and the policy limits are significantly lower than a potential recovery the insurer is obliged to accept a settlement offer." *Id.* "The bad-faith equation must include consideration of all of the facts and circumstances relating to whether the insurer's investigatory efforts prevented it from making an informed evaluation of the risks of refusing settlement." *Id.*

New York Courts consider several "factors to determine whether a defendant insurer acted with gross disregard in electing not to settle a claim." *Taveras v. American Transit Ins. Co.*, No. 24794/20, 2011 WL 4922215, at *6 (N.Y. Sup. Ct., Kings Cnty. Oct. 17, 2011). Generally, these factors include the following: (1) "whether the insurer in good faith considered [the insured's] interests as well as its own when making decisions as to settlement";[17] (2) whether "'the insured lost an actual opportunity to settle the claim' at a time when all serious doubts about the insured's liability were removed";[18] (3) "whether the insurer's investigatory efforts prevented it from making an informed evaluation of the risks of refusing settlement";[19] (4) "what, if any, attempts were made by the insurer to settle plaintiff's claim and at what point

_____

[17]     *Knobloch v. Royal Globe Ins, Co.*, 344 N.E.2d 364, 369 (N.Y. 1976) (internal quotation marks omitted).

[18]     *Pavia,* 626 N.E.2d at 28 (citing *U.S. Fidelity and Guar. Co. v. Copfer*, 400 N.E.2d 298, 298 [N.Y. 1979]).

[19]     *Pavia,* 626 N.E.2d 24 at 28.

during the underlying action those attempts were made";[20] (5) whether the insurer informed the insured of settlement negotiations;[21] (6) "the potential magnitude of damages and the financial burden to each party may be exposed to as a result of a refusal to settle";[22] and (7) whether "any other evidence . . . tends to establish or negate the insurer's bad faith in refusing to settle."[23]

## III.  ANALYSIS

After carefully considering the matter, the Court grants Defendant's motion for each of the reasons stated in its memoranda of law.  (*See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order.)  To those reasons the Court would add seven points.

With regard to the first factor set forth above in Part II.B. of this Decision and Order (i.e., whether the insurer in good faith considered the insured's interests as well as its own when making decisions about settlement), the Court finds that, in light of the evidence that was presented by Plaintiff and Defendant in the state court trial, it did *not* appear probable that the jury would find against Defendant in an amount in excess of the policy.  While a finding against Ranger was probable, a finding against Dwyer (who testified he was proceeding slowly in his own lane and had no chance to avoid the accident) was an entirely different matter.  Moreover, while it was undisputed Plaintiff's medical expenses exceeded $16,000, it was not clear she

---

[20]     *Taveras v. Am. Transit Ins. Co.*, No. 24794/20, 2011 WL 4922215, at *17 (N.Y. Sup. Ct., Kings Cnty. Oct. 17, 2011); *Doherty v. Merchant's Mut. Ins. Co.*, 903 N.Y.S.2d 836, 837 (N.Y. App. Div., 4th Dept. 2010) (noting that "it is settled that an insurer 'cannot be compelled to concede liability and settle a questionable claim' . . . simply 'because an opportunity to do so is presented'") (quoting *Pavia,* 626 N.E.2d 24 at 28).

[21]     *Smith v. Gen. Acc. Ins. Co.*, 697 N.E.2d 168, 171 (N.Y. 1998).

[22]     *Pavia,* 626 N.E.2d at 28; *Brockstein v. Nationwide Mut. Ins. Co.*, 417 F.2d 703, 706 (2d Cir. 1969).

[23]     *Pavia,* 626 N.E.2d 24 at 28.

would be entitled to more than $25,000 from Dwyer. For these reasons, the Court finds that this factor weighs decidedly against a finding of bad faith.

With regard to the second factor set forth above in Part II.B. of this Decision and Order (i.e., whether the insured lost an actual opportunity to settle the claim at a time when all serious doubts about the insured's liability were removed), the Court finds that, because Plaintiff's counsel demanded a "global settlement" of $85,000, Ranger offered her policy limit of $50,000, Dwyer's policy limit was $25,000, and Cogan refused to offer more than $3,000, there existed no "actual opportunity" for Defendant to settle Plaintiff's claim against Dwyer within his policy limit of $25,000. Had Plaintiff's counsel lowered his demand to $78,000, or relented on his demand of a "global settlement," things may have been different, but he did not do so. For these reasons, the Court finds that this factor weighs decidedly against a finding of bad faith.

With regard to the third factor set forth above in Part II.B. of this Decision and Order (i.e., whether the insurer's investigatory efforts prevented it from making an informed evaluation of the risks of refusing settlement), the Court finds that there was no deficiency in Defendant's investigatory efforts. Defendant's claims adjuster, Ms. August, tracked the case's progress in a 58-page activity log; depositions (or examinations before trial) were taken of Plaintiff, her sister Bonnie, Ranger, Dwyer and the Cogans; and, between the date of Plaintiff's execution of a stipulation voluntarily dismissing the action against Dwyer and the date of trial, neither the physical evidence in the case nor the controlling law changed. Being mistaken is not necessarily being negligent, much less grossly negligent (especially when a trial victory turns on a jury's weighing of witnesses' credibility). For these reasons, the Court finds that this factor weighs decidedly against a finding of bad faith.

With regard to the fourth factor set forth above in Part II.B. of this Decision and Order (i.e., what, if any, attempts were made by the insurer to settle plaintiff's claim and at what point during the underlying action those attempts were made), the Court finds that Defendant made efforts to settle Plaintiff's claim during both "Phase 1" and "Phase 2" of the action. *See, supra,* Part I.B. of this Decision and Order. Moreover, Plaintiff's counsel "tasked [Ms. August, who called more often than other adjusters] to get a global settlement," which she diligently attempted to do. (Dkt. No. 26, Attach. 5, at 45 [attaching page "44" of Lahn Dep. Tr.]; *see generally* Dkt. No. 26, Attach. 21, at 21-24 [attaching entries in Ms. August's Activity Log, from between Nov. 22, 2011, and Jan. 18, 2012].) For these reasons, the Court finds that this factor weighs decidedly against a finding of bad faith.

With regard to the fifth factor set forth above in Part II.B. of this Decision and Order (i.e., whether the insurer informed the insured of settlement negotiations), the Court finds that Defendant kept Dwyer adequately informed of Plaintiff's global settlement demand, his own risk of exposure to any excess verdict, and any settlement negotiations. The Court notes that Plaintiff's opposition memorandum of law appears conspicuously devoid of a citation to (1) any evidence that Dwyer had any questions about Ms. August's letter of October 29, 2008, (2) any evidence that Dwyer was for some reason not present in the courtroom when on February 7, 2012, Plaintiff stated on the record that the case could be settled if each insurer offered its policy limits, (3) an affidavit, declaration or deposition testimony that Dwyer had not been informed of the settlement negotiations between Plaintiff and Defendant, or (4) in any event, evidence showing that the practice in the insurance industry is for insurers to keep an insured abreast of such settlement negotiations. For these reasons, the Court finds that this factor weighs decidedly against a finding of bad faith.

With regard to the sixth factor set forth above in Part II.B. of this Decision and Order (i.e., the potential magnitude of damages and the financial burden to each party may be exposed to as a result of a refusal to settle), at first glance it appears that the financial burden or risk to Dwyer if no settlement was achieved was small (due to the fact that he had been proceeding slowly in his own lane, Plaintiff's medical damages were approximately $16,000, the policy limit was $25,000, and Ranger would probably be held liable); and the financial burden or risk to Defendant if no settlement was achieved was nonexistent (due to the fact that Plaintiff was demanding the policy limit of $25,000). However, upon closer examination, it is clear that this factor does not apply under the circumstances: there can be no meaningful balancing of the relative "burdens" or "risks" of non-settlement where there is no reasonable *possibility* of settlement (for the reasons discussed above with regard to the second factor). For these reasons, the Court finds that this factor is neutral.

Finally, with regard to the seventh factor set forth above in Part II.B. of this Decision and Order (i.e., whether any other evidence tends to establish or negate the insurer's bad faith in refusing to settle), the Court finds no other evidence that tends to establish any bad faith by Defendant. If anything, Mr. Lahm's unrelenting demand for a global settlement of $85,000 (which he "tasked" Defendant with achieving for him) negates any bad faith by Defendant. For these reasons, the Court finds that this factor weighs decidedly against a finding of bad faith.

**ACCORDINGLY**, it is

**ORDERED** that, while Plaintiff's Exhibits G through L (Dkt. No. 35, Attach. 1-14) are accepted for filing, the Clerk of the Court shall **STRIKE** from the docket Plaintiff's Amended Rule 7.1 Statement (Dkt. No. 35) for the reasons stated above in Part I.C.4. of this Decision and Order; and it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 26) is

**GRANTED**; and it is

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1, Attach. 1) is **DISMISSED**.

Dated: March 30, 2015
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge